**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

──────────

**No. 21-7239**

──────────

JORDAN ANDREW JONES,

        Plaintiff – Appellant,

v.

GEORGE T. SOLOMON, Director of the North Carolina Department of Public Safety; W. DAVID GUICE, Commissioner of the North Carolina Department of Public Safety; FRANK L. PERRY, Secretary of the North Carolina Department of Public Safety; RANDY S. MULL, Disciplinary Hearing Officer for the North Carolina Department of Public Safety; MIKE BALL, Superintendent of Avery-Mitchell Correctional Institution; JASON M. PENLAND, Assistant Superintendent for Programs of Avery-Mitchell Correctional Institution; GREGORY P. TAYLOR, Assistant Superintendent for Custody and Operations of Avery-Mitchell Correctional Institution; TIM LAUGHRUN, Classification Coordinator of Avery-Mitchell Correctional Institution; RENAE REEL, Captain designated Officer-in-Charge of Avery-Mitchell Correctional Institution; BONDY CARROLL, Correctional Sergeant for the Avery Unit of Avery-Mitchell Correctional Institution; MARTY COOPER; GILBERT LEWIS; STEPHEN P. CARPENTER; SCOTTY LOWERY; JOSEPH BUCHANAN; JOHN DOE, Captain or Lieutenant designated Officer-in-Charge of Avery-Mitchell Correctional Institution,

        Defendants – Appellees,

and

FNU WILLIAMS, Inmate Grievance Examiner for the North Carolina Department of Public Safety; ELIZABETH D. WALLACE, Inmate Grievance Examiner for the North Carolina Department of Public Safety; JASMINE BELYEU, Inmate Grievance Examiner for the North Carolina Department of Public Safety; JONNITA BAKER, Inmate Grievance Examiner for the North Carolina Department of Public Safety; JEFFREY A. DANIELS, Western Region Security Coordinator of the North Carolina Department of Public Safety; BRIAN WATSON, Special Affairs Captain of Avery-Mitchell Correctional Institution; ADRIAN Z. CROWE, Unit Manager

for the Avery Unit of Avery-Mitchell Correctional Institution; BRYAN DALE JOHNSON, Unit Manager for the Watauga Unit of Avery-Mitchell Correctional Institution; FNU CORNETT, Unit Manager for Yancey Unit of Avery-Mitchell Correctional Institution; JAMES C. WALDROOP, Assistant Unit Manager for the Avery Unit of Avery-Mitchell Correctional Institution; ROBIN HUDGINS, Assistant Unit Manager for Watauga Unit of Avery-Mitchell Correctional Institution; MARK RANDALL GEOUGE, Assistant Unit Manager for Yancey Unit of Avery-Mitchell Correctional Institution; TYLER STOCKTON, Correctional Officer for the Avery Unit of Avery-Mitchell Correctional Institution; FNU BANKS, Correctional Officer for the Avery Unit of Avery-Mitchell Correctional Institution; FNU BALL, Correctional Officer for the Avery Unit of Avery-Mitchell Correctional Institution,

     Defendants.

---

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:18–cv–00089–MR)

---

Argued:  October 31, 2023            Decided:  January 3, 2024

---

Before DIAZ, Chief Judge, and KING and WYNN, Circuit Judges.

---

Affirmed in part, reversed in part and remanded by published opinion.  Judge Wynn wrote the opinion, in which Chief Judge Diaz concurred.  Judge King wrote a separate opinion concurring in the judgment.

---

**ARGUED:**  Harry S. Graver, JONES DAY, Washington, D.C., for Appellant.  Orlando Luis Rodriguez, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  James M. Burnham, Miranda Cherkas Sherrill, JONES DAY, Washington, D.C., for Appellant.  Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

WYNN, Circuit Judge:

Plaintiff Jordan Jones appeals from the district court's decision granting summary judgment to the various defendants in this prisoner § 1983 case, in which Jones challenged the conditions of his confinement and an allegedly retaliatory transfer to another prison. We conclude that Defendants are entitled to qualified immunity on the conditions-of-confinement claim, and accordingly affirm as to that claim. Regarding Jones's retaliatory-transfer claim brought pursuant to the First Amendment, however, we conclude that the record, viewed in the light most favorable to Jones, precludes summary judgment as to one Defendant. We thus affirm in part and reverse in part, and remand for further proceedings.

I.

Because the district court granted summary judgment to Defendants, we relay the facts in the light most favorable to Jones. *Howard v. City of Durham*, 68 F.4th 934, 945 (4th Cir. 2023).

On April 27, 2015, Jones was a prisoner at North Carolina's Avery-Mitchell Correctional Institution. Around noon, prison officials saw him put an item in his mouth and suspected that he had ingested contraband. (Jones avers that the item he ingested was candy.) To determine whether Jones had ingested contraband, and to prevent him from accessing any such contraband after passing it, officials placed him in a "dry" cell within the prison's Restrictive Housing Unit. J.A. 74.[1] A "dry" cell is one in which the water to the sink and toilet has been turned off.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

Jones was ordered to strip down to a T-shirt and boxer shorts and informed that he had to produce three bowel movements before he would be released from the Restrictive Housing Unit. The dry cell was bare apart from a mattress.

Jones produced the three required bowel movements over the course of that afternoon and evening: around 2, 4:30 or 5:30, and 9 PM. The bowel movements were supervised by Correctional Officers Marty Cooper (first and second bowel movements), Gilbert Lewis (first bowel movement), Stephen Carpenter (second bowel movement), Joseph Buchanan (third bowel movement), and Scotty Lowery (third bowel movement). Captain Renae Reel was the officer in charge at the time of the third bowel movement, and she provided instructions to Buchanan and Lowery earlier in the evening.

The first two bowel movements followed the same procedures. Prison officials handcuffed Jones and brought him a portable toilet[2] containing a red biohazard bag. They removed his handcuffs and gave him toilet paper, closing the cell door to allow him to defecate and clean himself with the toilet paper. They then replaced his handcuffs to remove the portable toilet, after which they inspected the feces. However, at no time did they provide supplies for Jones to wash or sanitize his hands. And when Jones received a

---

[2] Jones's affidavit uses the term "bedpan" to describe the equipment brought to him for all three bowel movements. However, the video of the third bowel movement shows that it was a chair-like apparatus, and thus better described as a portable toilet than a bedpan.

4

meal at about 4 PM—supervised by Cooper[3]—he was not given utensils, so he had to eat the meal with unwashed hands.

Jones's third bowel movement—which was captured on surveillance video that is part of the record—took place under different circumstances. Buchanan and Lowery did not provide a biohazard bag; Jones's cell door remained open and he remained handcuffed while he defecated; and his request for toilet paper was denied until after the inspection was complete, meaning that he had to pull up and wear his boxers for approximately two and a half minutes before he had the chance to clean himself with the toilet paper.

After Jones had defecated, Buchanan and Lowery entered the cell, handed him two tongue depressors, and ordered him to inspect his feces. Defendants contend that they did not *force* Jones to inspect his own feces—rather that Jones "demand[ed]" to do so after his third bowel movement because he feared that the officers would "set him up." J.A. 258; *cf.* J.A. 80 (Jones averring that Defendant Gregory Taylor accused him of "coerc[ing]" Lowery and Buchanan "into having [him] make the feces inspection").

Although the district court ultimately "[a]ssum[ed] *arguendo* that [Jones] was forced to conduct the inspection" of his third bowel movement, it first cast doubt on that notion, stating that "[t]he video of the incident reflects that [Jones] was laughing and talking with Defendants Buchanan and Lowery" before taking the tongue depressors from them. *Jones v. Solomon*, No. 1:18-CV-00089-MR, 2021 WL 3519285, at *6 (W.D.N.C.

---

[3] Jones avers that he "was given a meal" around 4 PM, but does not state who provided the meal. J.A. 75. The record shows that Cooper was the officer in charge of the dry cell at that time. So, viewing the evidence in the light most favorable to Jones, we infer that Cooper was the officer to deny Jones utensils when he received this meal.

Aug. 9, 2021). But a court may reject a nonmoving party's version of events at summary judgment based on video evidence only if that evidence "blatantly contradict[s]" their version "so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). And the surveillance video, which lacks audio, does not "blatantly contradict[]" Jones's version of events. *Id.*; *accord Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 277 (4th Cir. 2011) (declining to apply *Scott* in part because video lacked sound). Instead, the video could be interpreted as showing Jones smiling uncomfortably while Buchanan and Lowery laugh and joke with *each other*. Interpreting the record in the light most favorable to Jones, therefore, we will assume Buchanan and Lowery instructed him to inspect the third bowel movement.

Jones's inspection of the feces, which took about 25 seconds, revealed no contraband, so the officers took the portable toilet from Jones's cell and removed his handcuffs. They did not give Jones any supplies to clean his hands or cell before or after the inspection.

Around 11 PM, Buchanan gave Jones a cup of water and a blanket. The prison turned the water in Jones's cell back on around 5:30 AM the next day, and he was permitted to shower, dress, and clean his cell at around 8 PM. He thus went without running water for about 17 hours (about 15.5 hours after the first bowel movement), was in soiled clothing for about 23 hours, and went without a shower, soap, or cleaning supplies for about 30 hours following his first bowel movement. This meant that he had some fecal matter on his person and clothing for about a day in the aftermath of the bowel movements, *see* J.A. 215–16, in an incident that Defendants concede was unsanitary, "disgusting," and a "clear

6

violation of policy," Oral Arg. at 20:40–20:44, *available at* https://www.ca4.uscourts.gov/OAarchive/mp3/21-7239-20231031.mp3.

To be sure, the surveillance video does not show visible soiling on Jones. For that reason, the district court concluded that the video "refutes [Jones's] claim that his hands, arms, and clothing were soiled." *Jones*, 2021 WL 3519285, at *6.

We disagree with this categorical statement. The video does not "blatantly contradict[]" Jones's account. *Scott*, 550 U.S. at 380. It is not a close-up video; does not depict the inside of Jones's boxers; and, of course, would not capture smaller amounts of soiling, or even significant amounts of dried urine, on his hands or arms.

Jones was released from the Restrictive Housing Unit on April 30 and, three days later, began filing grievances related to his stay in the Restrictive Housing Unit and other incidents. In one grievance, Jones alleged "that he was treated unfair when he was placed on Close Observation to submit a bowel movement and forced to inspect the bowel [sic] himself." J.A. 173. The grievance examiner found that the grievance had merit and noted that "corrective action ha[d] been taken." *Id.* Buchanan and Lowery were later recommended for disciplinary action because they had failed to follow the appropriate procedures for searching inmate stool and exercised "poor judgement" when Jones searched his own stool, which was "clearly a policy violation" because "inmates are never permitted to inspect they [sic] stool samples for sanitary reasons." J.A. 286 (capitalization altered).

Jones's grievances caused a stir. On May 26, 2015, a Restrictive Housing Unit sergeant informed Jones that his grievances would "probably" result in his transfer to

another facility. J.A. 78. On June 22, Buchanan told another inmate that Jones would "probably" be transferred due to his complaints. J.A. 123. After receiving an August 6 grievance, a Unit Manager at Avery-Mitchell called Jones to his office and asked Jones if he was "seeking a transfer" by submitting grievances. J.A. 79. When Jones denied seeking a transfer, the manager responded, "I can't tell." *Id.* On October 13, Defendant Taylor, the Assistant Superintendent for Custody and Operations at Avery-Mitchell, met with Jones to discuss his various grievances and instructed Jones to "'ease up' on the grievances" because they "were not helping [Jones] stay at Avery-Mitchell." J.A. 80.

One or two days after the latter incident, on October 14 or 15, 2015, Taylor ordered Jones's transfer from Avery-Mitchell to Lanesboro Correctional Institution. The transfer was unwelcome: Lanesboro was "widely known to be a dangerous facility" and had "a much worse reputation than Avery-Mitchell"; an inmate who had assaulted Jones was housed at Lanesboro at the time; and Jones's transfer disenrolled him from a computer-applications class at Avery-Mitchell.[4] J.A. 80; *see* J.A. 187.

Defendants' explanation for the transfer shifted over time. Defendant Tim Laughrun wrote a note at the time of Jones's transfer reflecting that Jones was moved "due to

---

[4] In his motion for summary judgment, Jones further claimed that he "was close to home" at Avery-Mitchell "and able to enjoy weekly visits with his family, friends and elderly grandparents," whereas his transfer to Lanesboro "inhibited and al[]together prevented visitation, due to the length[]y drive for [his] visitors." Memorandum of Law in Support of Motion for Summary Judgment at 25, *Jones v. Solomon*, No. 1:18-cv-00089-MR (W.D.N.C. Oct. 26, 2020), ECF No. 91. However, he cited no evidence in support of that contention. And while he was pro se at the time of that filing, he has not cited any evidence to support the assertion in his counseled brief on appeal, either. Accordingly, we do not consider whether the transfer impacted Jones's ability to receive visitors.

8

numerous issues with staff which could lead to security issues in the future." J.A. 302 (capitalization altered). Defendants Mark Geouge and James Waldroop similarly noted that the transfer was "for security reasons." J.A. 187 (Geouge's note); *accord* J.A. 194 (Waldroop's note stating he "was informed" that Jones was transferred "due to numerous issues with staff / relatives that could become a security issue in the future"); *see also* J.A. 81 (Jones averring that he "was later informed that [his] transfer . . . was due to multiple issues with staff which could be a security risk"). Yet in this litigation, Defendants responded to an interrogatory asking why Jones was transferred by noting that Taylor "state[d] that [Jones]'s behavioral issues, in particular his sexual activities with other inmates[,] were creating problems for other inmates and the staff." J.A. 261. For his part, Jones avers that he later asked Taylor why he was transferred, and Taylor responded, "I think you know why." J.A. 82.

Jones was transferred back to Avery-Mitchell after less than two weeks. He continued to pursue his grievances while at Lanesboro and once back at Avery-Mitchell.

Proceeding pro se,[5] Jones brought suit in federal court in April 2018, naming dozens of defendants in their individual and official capacities. He sought declaratory, injunctive, and monetary relief—including both compensatory and punitive damages—as well as "[a]ny additional relief this Court deems just, proper and equitable." J.A. 238–39. Four claims against sixteen defendants survived initial review under 28 U.S.C. § 1915. The parties proceeded to discovery and filed cross-motions for summary judgment, and the

---

[5] The district court appointed North Carolina Prisoner Legal Services for the limited purpose of assisting Jones with discovery.

district court granted summary judgment to Defendants on all claims. *Jones*, 2021 WL 3519285, at *10.

Jones timely appealed and filed a pro se informal opening brief. This Court appointed counsel, noting that the "issue of particular interest to the Court" was "[w]hether [D]efendants were entitled to summary judgment on [Jones's] First Amendment retaliation and Eighth Amendment conditions of confinement claims." Notice Regarding Confirmation of Assignment of Counsel at 1, *Jones v. Solomon*, No. 21-7239 (4th Cir. Feb. 3, 2023), ECF No. 18. Formal briefing and oral argument on those issues followed.[6]

## II.

"We review de novo district court decisions on motions for summary judgment[.]" *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023), *petition for cert. filed*, No. 23-644 (U.S. Dec. 14, 2023). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a genuine dispute exists

---

[6] In addition to the two claims fleshed out in formal briefing, Jones's informal brief appealed the district court's grant of summary judgment to Defendants on his other claims—Eighth Amendment claims related to policies and failure to train, and due process claims. "Under these circumstances, we treat the formal brief as definitive of the issues for review and, applying the normal rule of waiver, consider only those issues, unless an inspection of the record indicates that failure to consider other issues might result in grave injustice." *Slezak v. Evatt*, 21 F.3d 590, 593 n.2 (4th Cir. 1994). We are satisfied that no such grave injustice would result here, and accordingly limit our discussion to the two claims addressed in formal briefing and at oral argument.

'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Here, the evidence includes Jones's affidavit, verified complaint, and verified amended complaint.[7] "[S]elf-serving affidavits offered by the non-movant" can be used as evidence to "defeat summary judgment," *Pfaller v. Amonette*, 55 F.4th 436, 450 (4th Cir. 2022), at least when they are "based on personal knowledge or firsthand experience," *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017) (unpublished but orally argued) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). The same is true of verified complaints. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (reversing grant of summary judgment to defendant officials based on evidence provided in verified complaint, which is treated as "the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge").

Jones brings his constitutional claims pursuant to 42 U.S.C. § 1983, which "creates a cause of action against any person who, acting under color of state law, abridges a right

---

[7] "A complaint is 'verified' if it is 'signed, sworn, and submitted under penalty of perjury.'" *Goodman v. Diggs*, 986 F.3d 493, 495 n.2 (4th Cir. 2021) (quoting *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020)). While Jones's complaints lack explicit statements that they are submitted under penalty of perjury, they do include a notarial certificate for an oath or affirmation pursuant to North Carolina law. *See* J.A. 58, 241; N.C. Gen. Stat. § 10B-43(a). And in North Carolina, an oath or affirmation both require "a vow of truthfulness on penalty of perjury." N.C. Gen. Stat. § 10B-3(2)(c), (14)(c). So, we conclude that both constitute verified complaints. *See Goodman*, 986 F.3d at 495 n.2 (looking to similar evidence in Virginia); *see also id.* at 498–99 (noting that an original verified complaint retains its evidentiary value even if an amended complaint, verified or unverified, is filed).

11

arising under the Constitution or laws of the United States." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Liability under § 1983 must be analyzed individually for each defendant. *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023).

Additionally, "[a]lthough the district court did not rule on [qualified immunity] and instead found that there was no [constitutional] violation in the first instance, the argument was raised below and is therefore properly before the Court," and we may consider it "[i]n the interest of judicial economy." *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 192, 195 (4th Cir. 2015); *see* Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 23–24, *Jones v. Solomon*, No. 1:18-cv-00089-MR (W.D.N.C. Jan. 21, 2021), ECF No. 97. "Qualified immunity protects government officials from civil liability and suit insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019) (internal quotation marks omitted), *as amended* (June 10, 2019). "To overcome an official's claim of qualified immunity, the plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. A court need not address those inquiries in sequence, but instead may exercise its sound discretion in deciding which issue to first address. The official is entitled to qualified immunity if either prong is not satisfied." *Id.* (citations and internal quotation marks omitted).

"In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first [(constitutional right)] prong, and the officer bears the burden on the second [(clearly established)] prong." *Stanton v. Elliott*, 25

12

F.4th 227, 233 (4th Cir. 2022). In conducting the qualified-immunity analysis, we view the evidence in the light most favorable to Jones. *See Aleman*, 80 F.4th at 287 (describing qualified-immunity analysis at the summary-judgment stage).

"[T]o determine whether a right was clearly established, we first look to cases from the Supreme Court, this Court, or the highest court of the state in which the action arose." *Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020). "In the absence of 'directly on-point, binding authority,' courts may also consider whether 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Id.* (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017)). However, the Supreme Court has warned "against defining a right at too high a level of generality." *Id.* That does not mean that a plaintiff must cite a case with facts on all fours with his. *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019) ("In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two."). And "we require less specificity in [the] Eighth Amendment context." *Younger v. Crowder*, 79 F.4th 373, 385 (4th Cir. 2023). Even in that context, though, "we must define the right 'in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Cox v. Quinn*, 828 F.3d 227, 238 (4th Cir. 2016)).

## III.

We first address the district court's grant of summary judgment to Defendants on Jones's Eighth Amendment conditions-of-confinement claim arising out of his time in the dry cell. We affirm on the basis of qualified immunity.

13

Jones brought this claim against Defendants Reel, Cooper, Lewis, Carpenter, Lowery, and Buchanan.[8] At the outset, we need not conduct a defendant-by-defendant analysis, except for Cooper, because these Defendants were all at least partially responsible for the challenged conditions and we conclude that even those conditions in their totality did not violate a clearly established right. We do conduct an individualized analysis for Cooper because he alone supervised Jones's meal after his second bowel movement and deprived Jones of both utensils and the opportunity to clean his hands.

Viewed in the light most favorable to Jones, he was placed in a cell with no running water for about 17 hours. During that time, he was not given any means to clean himself, other than toilet paper, despite defecating in a portable toilet three times (supervised variously by Cooper, Lewis, Carpenter, Lowery, and Buchanan). After defecating the first time (supervised by Cooper and Lewis), he had to eat a meal (supervised by Cooper) without utensils and without having any means to clean his hands other than the toilet paper he had used after the first bowel movement. After defecating the third time (supervised by Lowery and Buchanan, under Reel's instruction), he was not given toilet paper with which to clean himself until after the inspection was complete, meaning he soiled his boxers when he wore them briefly during the inspection. He was not able to shower or change his clothing until nearly 24 hours after that third bowel movement, despite having some feces on his hands and clothing. And Lowery and Buchanan forced him to search through his own feces after the third bowel movement using tongue depressors.

---

[8] He also brought the claim against either Jason or Timothy Penland, but the record includes no evidence related to either Penland's involvement in the challenged conduct.

14

These facts depict a sequence of events that are gross, degrading, and deeply concerning. And we have serious doubts about their constitutionality. But, even assuming Defendants violated Jones's Eighth Amendment right to be free from cruel and unusual punishment, we conclude that they are entitled to qualified immunity under the clearly established prong of the qualified-immunity analysis.

"In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that the deprivation of a basic human need was *objectively* sufficiently serious, and that *subjectively* the officials acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (cleaned up).

"Because evolving precepts of humanity and personal dignity animate the Eighth Amendment, we are guided by contemporary standards of decency in determining whether an alleged harm is sufficiently deleterious to satisfy the objective component of an Eighth Amendment claim." *Id.* However, because "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), "only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim," *Shakka*, 71 F.3d at 166. That is, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347. In assessing whether conditions of confinement violate the Eighth Amendment, we consider the totality of the circumstances of confinement, as long as the conditions "deprived [the plaintiff] of a specific human

15

need." *Williams*, 952 F.2d at 824. However, each Defendant may only be held responsible "for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

To show the requisite extreme deprivation to support an Eighth Amendment claim, "a prisoner must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions, or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (cleaned up). Here, Jones relies on demonstrating a substantial risk of serious physical injury.

While Jones presents no medical or scientific evidence elucidating the level of risk of physical injury his conditions of confinement exposed him to, "[t]here is no requirement . . . that a plaintiff alleging [an Eighth Amendment claim] present expert testimony to support his allegations of . . . [a] substantial risk of serious injury." *Scinto v. Stansberry*, 841 F.3d 219, 230 (4th Cir. 2016). Rather, such evidence is "necessary . . . only when it will 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting Fed. R. Evid. 702(a)). By contrast, "[w]hen laypersons are just 'as capable of comprehending the primary facts and of drawing correct conclusions from them' as are experts, expert testimony may properly be excluded." *Id.* (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)). For example, we have held that "a jury is capable of understanding, unaided, the risks of failing to provide insulin to a diabetic and of a trained doctor's denial of a diabetic's known need for insulin." *Id.* This does mean, however, that Jones's claim rests on lay intuition about the general risks posed by exposure to feces, rather than specific evidence setting forth that risk.

16

At the time Jones was placed in a dry cell in April 2015, it was clearly established that inmates were entitled to "decent and basically sanitary living conditions and . . . the basic elements of hygiene." *Hite v. Leeke*, 564 F.2d 670, 672 (4th Cir. 1977) (cleaned up); *see also Rhodes*, 452 U.S. at 347 (prison officials may not "deprive inmates of the minimal civilized measure of life's necessities"). And it was clearly established that acute exposure to sewage and severe deprivations of articles of personal hygiene violated the Eighth Amendment. *E.g.*, *McCray v. Burrell*, 516 F.2d 357, 367 (4th Cir. 1975) (en banc) (Eighth Amendment violation where plaintiff spent nearly 48 hours nude in a frigid cell with no sink or toilet—"the only sanitary facility was . . . a hole in the floor, six to eight inches across, covered by a removable metal grate which was encrusted with the excrement of previous occupants"—and no "articles of personal hygiene, including toilet paper"); *Williams*, 952 F.2d at 825 (Eighth Amendment violation where plaintiff was kept on an ongoing basis in a prison suffering from serious overcrowding, which exacerbated the prison's "unsanitary conditions," including a toilet shared by twelve inmates that was "constantly coated with urine day and night," the presence of only four showers for ninety-six inmates, and "floors leading to the showers" that "were constantly flooded with sewage as a result of toilets that continually leak[ed]").

But we are again mindful of the Supreme Court's caution against defining the violation of a right at too high a level of generality. *Ray*, 948 F.3d at 229. So, while it was clearly established in 2015 that the conditions present in *McCray* and *Williams* violated the Eighth Amendment, the question before us is whether "a reasonable officer in [Defendants'] position would have known that" the conditions they inflicted on Jones were

17

"unlawful at the time." *Id.* at 230. And those conditions, while deplorable, were far less extreme than *McCray* and *Williams* in terms of the quantity of human waste to which Jones was exposed, and therefore the health risk the conditions imposed on him were lower.

Furthermore, our case law in 2015 would have suggested to a reasonable officer that the Eighth Amendment does not require absolutely sterile, pristine prison environments. Our 1975 en banc decision in *McCray v. Burrell* is instructive.[9] *McCray*, 516 F.2d 357. As noted above, *McCray* found an Eighth Amendment violation when the plaintiff was placed nude in a solitary, cold cell for nearly 48 hours—"without [a] blanket or mattress[,] . . . with nowhere to sit, lie or lean except against bare concrete or bare tile," and with only a six-inch hole covered by a grate encrusted with others' excrement to use as a toilet—and could not bathe or use any "articles of personal hygiene, including toilet paper." *Id.* at 367, 369.

Separately, however, *McCray* involved a second, less extreme incident. In that case, the plaintiff was also "placed naked in an isolation cell for a period of 48 hours" for observation related to mental instability. *Id.* at 360. That time, however, while he had "no materials with which to clean himself or the cell" for the first 24 hours, both he and the cell were cleaned at that point, and then he was returned to the cell for another 24 hours. *Id.* at 366. Additionally, "[t]he cell did contain a toilet and a sink," although the Court did "not

---

[9] Of course, we assess Eighth Amendment violations based on "contemporary standards of decency," and *McCray* is nearly fifty years old. *Shakka*, 71 F.3d at 166. But regardless of whether we would decide *McCray* the same way today based on modern standards of decency, we may consider it when evaluating the matter of clearly established law.

know if either could be operated by [the plaintiff] from within the cell or whether a guard was available to render them operative where their use was indicated." *Id.* at 368. And, as in the other incident, the plaintiff "was deprived of essential articles of hygiene." *Id.*

As to this second incident, we held that while "[t]he conditions of confinement . . . came perilously close to a denial of [E]ighth [A]mendment rights in and of themselves, . . . *the record [wa]s not sufficiently complete that we rest[ed] our decision on this ground.*" *Id.* at 368 (emphasis added). Rather, on the record in that case, we concluded that the "conditions of confinement *per se* [did] not mount up to a denial of [the plaintiff's] rights under the [E]ighth [A]mendment."[10] *Id.*

Certainly, the plaintiff in *McCray* may have had some access to running water during the less severe incident, which Jones undisputedly did not. But on the other hand, that incident in *McCray* also involved other conditions—such as the temperature—that likely informed our "perilously close" language. And because we held that the conditions in that incident did not independently violate the Eighth Amendment, *McCray* did not clearly establish a lower bound for constitutional violations based solely on unsanitary conditions.

Nor have we located any other Fourth Circuit or Supreme Court case that would have alerted a reasonable correctional officer that, in the specific facts of this case—which include a relatively short duration, access to toilet paper, an otherwise clean cell, the

---

[10] We concluded, however, that the prison *did* violate the Eighth Amendment in allowing those conditions to persist unnecessarily by not bringing in a psychologist to evaluate the plaintiff expeditiously. *McCray*, 516 F.2d at 368–69.

19

removal of the waste from the cell after each bowel movement, access to other necessities like a blanket, and the lack of any evidence of underlying medical conditions making Jones more susceptible to illness—depriving Jones of the means to clean his hands, arms, and clothing for about a day exposed him to a substantial risk of serious physical harm in violation of the Eighth Amendment.

Additionally, there is no "robust consensus of persuasive authority" showing that Jones's rights were violated. *Williams*, 917 F.3d at 769 (quoting *Booker*, 855 F.3d at 544). Jones cites other circuit cases that, like *McCray* and *Williams*, involved much more extreme circumstances than those present here. *See* Opening Br. at 23–24 & n.6 (collecting cases). For example, in *LaReau v. MacDougall*, the Second Circuit found an Eighth Amendment violation where an inmate was held for five days in a "strip cell," during which he spent "substantial periods of time . . . in almost total darkness" and "in total silence," with "no sink, water fountain or commode," and instead just "a hole in the floor in the corner of the cell covered with a grate" to be used as a toilet. *LaReau v. MacDougall*, 473 F.2d 974, 977 (2d Cir. 1972); *accord Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (per curiam) (collecting cases); *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam) (holding, where the plaintiff was kept in "a pair of shockingly unsanitary cells" for six days—the first cell was "covered, nearly floor to ceiling," in feces, while the second was "frigidly cold" and had "raw sewage" spilling on the floor, in which the plaintiff was forced to "sleep naked"— that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time").

20

In cases involving less extreme situations, however, other circuit courts have declined to find Eighth Amendment violations. *E.g.*, *Lunsford v. Bennett*, 17 F.3d 1574, 1577, 1580 (7th Cir. 1994) (rejecting Eighth Amendment claim where the "plaintiffs were denied toilet paper, personal hygiene items, and cleaning supplies" for about 24 hours, where "[t]he record contain[ed] no evidence indicating that [the] plaintiffs' cells were unusually dirty or unhealthy, or that health hazards existed"); *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 958 (8th Cir. 1994) (rejecting Eighth Amendment claim related to "deplorabl[y]" filthy cell conditions—including feces, vomit, mucus, urine, and rotting food—because of the short duration of the exposure); *Harris v. Fleming*, 839 F.2d 1232, 1234 (7th Cir. 1988) (rejecting Eighth Amendment claim where plaintiff "assert[ed] that he was not provided with toilet paper for five days[,] . . . that he lacked soap, [a] toothbrush, and toothpaste for ten days[, and] . . . . that he was kept in a filthy, roach-infested cell"); *Giles v. Godinez*, 914 F.3d 1040, 1051–52 (7th Cir. 2019) (concluding that conditions including "vermin infestations" and "filthiness" did "not support a finding that [the plaintiff] was deprived of the minimal civilized measure of life's necessities"); *cf. Whitington v. Ortiz*, 472 F.3d 804, 808 (10th Cir. 2007) ("A deprivation of hygiene items without any corresponding injury would not state an Eighth Amendment violation."). Regardless of whether we would reach the same results as these other circuit courts if faced with similar facts, this case law demonstrates that there is no consensus of persuasive authority pointing to the violation of a clearly established right in this case.

We are aware of one case in which another circuit found a plausible Eighth Amendment violation when an inmate was exposed to conditions somewhat akin to those

21

here. *See Young v. Quinlan*, 960 F.2d 351, 355 (3d Cir. 1992) (involving an HIV-positive inmate placed in "dry cell" for four days with no toilet, running water, toilet paper, access to a shower, or ability to wash before eating, during which time he suffered from diarrhea and had to urinate and defecate in a corner of his cell), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000). But that case involved both a longer duration (four days) and an HIV-positive inmate, who therefore was more susceptible to illness or infection than a healthy inmate would be. *Id.* And a single out-of-circuit case, which involved more severe health risks, does not provide the sort of consensus of persuasive authority that could create a clearly established right. *See Fijalkowski v. Wheeler*, 801 F. App'x 906, 913 (4th Cir. 2020) (unpublished but orally argued) ("One case is not a robust consensus of persuasive authority.").

We recognize that, in addition to the general evidence of feces exposure, the record reveals that Cooper forced Jones to eat a meal with soiled hands. But it was not clearly established in April 2015 that giving a prisoner a single meal without utensils after they had defecated once and had access to toilet paper, but not soap or water, would violate the Eighth Amendment. *See White v. Gregory*, 1 F.3d 267, 269 (4th Cir. 1993) (rejecting as "meritless" a claim based on receiving only two meals a day—that is, being entirely deprived of the normal third meal—on weekends and holidays); *Daigre v. Maggio*, 719 F.2d 1310, 1312 (5th Cir. 1983) (rejecting Eighth Amendment claim where inmates had "access to cold running water," but not soap, while in their cells, so that they could "not wash their hands with soap between using the toilet and eating their meals").

22

In sum, it was not clearly established in April 2015 that the conditions Jones faced posed a substantial risk of serious harm in violation of the Eighth Amendment.

To be clear, we are not holding that a case's facts must reach the horrific levels of those in *Taylor* and the other extremely egregious cases discussed above in order to violate clearly established law. Those cases, which "depict[] abominable . . . conditions, do not demarcate the [E]ighth [A]mendment threshold." *Harris*, 839 F.2d at 1235. That is, qualified immunity might not bar a claim relating to conditions only somewhat more severe than those presented here, or conditions akin to those here but persisting for only a slightly longer duration. Further, a court presented with more specific evidence about the health risks posed by particular conditions could well conclude that, in light of that evidence, a reasonable officer should have known that exposing the inmate to those risks violated clearly established law.

Under binding case law, however, a defendant official is entitled to qualified immunity where his actions did not violate a *clearly established* right. And while it was clearly established in 2015 that prisoners were entitled to basically sanitary living conditions, it was not clearly established that conditions of the caliber set forth by the record here were so unsanitary as to alert Defendants that they had crossed the constitutional line. Accordingly, we affirm the district court's decision granting summary judgment to Defendants on Jones's Eighth Amendment claim.

IV.

Jones also appeals the district court's grant of summary judgment to Defendants on his retaliation claim. Jones alleges that Defendants transferred him from Avery-Mitchell to

23

Lanesboro in retaliation for his filing of grievances. We conclude that the district court erred in granting summary judgment to Taylor on this claim. We affirm as to the other defendants.

"To state a colorable First Amendment retaliation claim, a plaintiff must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct." *Martin v. Duffy* (*Martin II*), 977 F.3d 294, 299 (4th Cir. 2020) (cleaned up).

There is no dispute that Jones has satisfied the first prong of this test: filing grievances is a protected activity. *Martin v. Duffy* (*Martin I*), 858 F.3d 239, 249 (4th Cir. 2017); *see* Response Br. at 14 (conceding this point).

And we find little difficulty concluding that there is at least a genuine dispute of material fact on causation as to Taylor, who made the transfer decision: Jones avers that Taylor told him at most two days before he was transferred to "'ease up' on the grievances" because they "were not helping [Jones] stay at Avery-Mitchell" and that he later asked Taylor why he was transferred and Taylor responded, "I think you know why." J.A. 80, 82. Moreover, Jones has put forward evidence that other prison officials made similar statements, which may cast light on the general culture at the prison or on what other prison officials knew about Taylor's decision-making process. *See* J.A. 81, 187, 194, 302. And, viewing the facts in the light most favorable to Jones, Defendants' alternate explanation for the transfer has shifted over time, creating doubt as to the veracity of that explanation.

24

Defendants contend that the evidence shows that they would have made the same decision to transfer Jones with or without his protected conduct. But in support, Defendants have pointed only to their own general assertions that Jones was transferred for permissible reasons. That is not enough to meet their burden under the same-decision test, at least not at the summary-judgment stage. *See Martin II*, 977 F.3d at 305 (finding dispute of material fact where the defendant "failed to identify any specific[s]" regarding her supposed reasons for taking the challenged action).

We note that, while Taylor made the decision to transfer Jones, Laughrun carried out the transfer. However, Jones has put forth no evidence that Laughrun acted out of a retaliatory motive, nor does our review of the record reveal any. Jones's complaint also brought this claim against two other defendants (Mike Ball and Jason Penland), but he cites no evidence regarding their involvement, nor are we aware of any.

Instead, Jones argues that "precisely identifying the culpable parties is best done on remand." Reply Br. at 12. But as the appellant, he bears the burden of putting forward arguments for why remand is appropriate. *See* Fed. R. App. P. 28(a)(8). And, although the district court did not rest its analysis on causation, "we may affirm a grant of summary judgment on any ground that the law and the record permit." *Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 251 n.3 (4th Cir. 2018) (cleaned up). In the absence of evidence supporting causation for any defendant other than Taylor, we affirm summary judgment as to the other defendants.

Having concluded that the first and third prongs of the retaliation analysis are satisfied as to Taylor, we turn to the primary issue before us on appeal: whether the transfer

25

can constitute an adverse action that satisfies the second prong of the retaliation analysis. "For purposes of a First Amendment retaliation claim under Section 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin I*, 858 F.3d at 249 (cleaned up) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). This is an "objective standard"; thus, "[w]hile the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive." *Constantine*, 411 F.3d at 500. That said, "a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to her exercise of First Amendment rights." *Id.* (quoting *Am. C.L. Union of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 786 n.6 (4th Cir. 1993)).

Prison officials certainly have broad latitude to relocate prisoners as needed for the purposes of prison administration and safety. *E.g.*, *Olim v. Wakinekona*, 461 U.S. 238, 246 (1983) ("Overcrowding and the need to separate particular prisoners may necessitate interstate transfers."); *O'Bar v. Pinion*, 953 F.2d 74, 83 (4th Cir. 1991) ("Changes in [a] prisoner['s] location . . . are matters contemplated within the scope of his original sentence to prison."). But they may not violate the First Amendment by transferring a prisoner in retaliation for protected conduct. *E.g.*, *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020) ("[T]he fact that a prisoner does not have a constitutional right to a particular prison placement does not doom [the plaintiff]'s case. If the transfer was indeed retaliatory, then [that is a] violation of [his] First Amendment right[s.]"); *Toolasprashad v. Bureau of*

26

*Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002) ("Despite the fact that prisoners generally have no constitutionally-protected liberty interest in being held at, or remaining at, a given facility, . . . the Bureau may not transfer an inmate to a new prison in retaliation for exercising his or her First Amendment rights." (cleaned up)).

Additionally, a transfer or placement in a more restrictive or dangerous setting can constitute an adverse action. *E.g.*, *Martin I*, 858 F.3d at 250 ("Certainly, placing an inmate in administrative segregation could deter a person of ordinary firmness from exercising his First Amendment rights." (cleaned up)); *Morris v. Powell*, 449 F.3d 682, 687 (5th Cir. 2006) ("There is no doubt that transfer to a more dangerous prison as a penalty for the exercise of constitutional rights has the potential to deter the inmate from the future exercise of those rights."); *cf. Holleman*, 951 F.3d at 881 ("A transfer that objectively *improves* the prisoner's condition . . . would not deter a person of ordinary firmness from engaging in protected activity." (emphasis added)).

Viewed in the light most favorable to Jones, the facts in this case support the conclusion that the transfer was an adverse action. The evidence indicates that Lanesboro was, at minimum, perceived by inmates to be more dangerous than Avery-Mitchell. And Lanesboro posed a particular danger for Jones: another prisoner who had previously assaulted him was housed there. Beyond the potential consequences for his physical safety, Jones also experienced another consequence from the transfer—it automatically disenrolled him from a computer-applications class he was taking at Avery-Mitchell. Moreover, we can infer from the prison officials' statements that Jones's transfer was intended to be punitive, which suggests that something about that transfer—whether having

27

to leave Avery-Mitchell, having to go to Lanesboro, or both—was intended to negatively impact Jones.

We have little trouble concluding that the combined effect of these aspects of the transfer "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin I*, 858 F.3d at 249 (internal quotation marks omitted) (quoting *Constantine*, 411 F.3d at 500). And while it is true that Jones himself was apparently not deterred (because he continued to pursue his grievances following both the threats of and the actual transfer), his own reaction "is not dispositive." *Constantine*, 411 F.3d at 500. At most, it creates a genuine dispute of fact as to whether the transfer constituted an adverse action.

In concluding otherwise, the district court appears to have focused on what happened *after* the transfer. The court noted that Jones "failed to forecast any evidence that [t]he conditions he experienced at Lanesboro were appreciably different than the ones at [Avery-Mitchell], or that he ever encountered the inmate who previously assaulted him," and also seemed to take into consideration that Jones ultimately only spent twelve days at Lanesboro. *Jones*, 2021 WL 3519285, at *10. But because the alleged retaliatory adverse action was the transfer itself, facts relating to what occurred after the transfer are insufficient to warrant summary judgment for the Defendants.

We note that the district court's analysis may have been affected by its statement that "[i]n the prison context, retaliation claims are treated with skepticism." *Id.* at *9 (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). To be sure, our 1994 opinion in *Adams v. Rice* and a later en banc case, *Cochran v. Morris*, contain statements to that effect. *See*

28

*Adams*, 40 F.3d at 74 ("Claims of retaliation must . . . be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions."); *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (en banc) (same). But *Adams* and *Cochran* are distinguishable. In both cases, we were engaging in the highly deferential review of a dismissal of claims as "frivolous" pursuant to 28 U.S.C. § 1915,[11] and we affirmed that dismissal where the plaintiff's complaint rested on generalized grievances or a broad-strokes conspiracy allegation. *See Adams*, 40 F.3d at 74–75; *Cochran*, 73 F.3d at 1317–18. *Adams* emphasized that a prisoner cannot just throw out an accusation of retaliation without any allegation as to "how or why [the] defendants retaliated against" him, *Adams*, 40 F.3d at 74, and *Cochran* rejected the plaintiff's "assortment of vague accusations," *Cochran*, 73 F.3d at 1318.

But the concerns underlying *Adams* and *Cochran*—that the federal courts not be used as fora to litigate every little inmate grievance dressed up as a retaliation claim—are not implicated by this case. Jones has made a specific claim of retaliation related to specific protected activity that survived § 1915 review, and his claim is now being addressed at the summary judgment stage. *Adams* and *Cochran* speak to how courts are to evaluate prisoners' retaliation claims when conducting § 1915 frivolity review; they do not mean that such claims are treated differently from others for the life of the litigation.

---

[11] *Adams* and *Cochran* refer to § 1915(d), but the current applicable code section is § 1915(e)(2)(B)(i), following April 26, 1996, amendments that restructured and modified § 1915. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 804(a), 110 Stat. 1321, 1321–73 to –74. We have continued to apply the same deferential standard to frivolity dismissals after these amendments as we did before. *See Nagy v. FMC Butner*, 376 F.3d 252, 254–55 & n.* (4th Cir. 2004).

Defendants also argue that they are entitled to qualified immunity on this claim. We disagree. The facts, viewed in the light most favorable to Jones, support that Taylor ordered his transfer to another prison in retaliation for his filing of grievances. This Court has held that the "First Amendment right to be free from retaliation by prison officials for filing a grievance was clearly established in 2010." *Martin I*, 858 F.3d at 251. And the Supreme Court held in 1983 that a State may "confine [an] inmate in any penal institution in any State *unless* there is state law to the contrary *or the reason for confining the inmate in a particular institution is itself constitutionally impermissible*." *Olim*, 461 U.S. at 248 n.9 (emphases added). So, when Taylor ordered Jones transferred in October 2015, it was clearly established that transferring a prisoner to another institution in retaliation for the prisoner filing a grievance violated his First Amendment rights.

Thus, we conclude that the district court erred in granting summary judgment to Taylor on the retaliatory-transfer claim.

## V.

In sum, we conclude that all Defendants are entitled to qualified immunity on the conditions-of-confinement claim, and accordingly affirm as to that claim brought pursuant to the Eight Amendment. But regarding Jones's retaliatory-transfer claim, we affirm as to all Defendants except Taylor because the record, viewed in the light most favorable to Jones, precludes summary judgment as to Taylor on Jones's claim brought pursuant to the First Amendment. We thus affirm in part and reverse in part, and remand for further proceedings.

*AFFIRMED IN PART, REVERSED IN PART AND REMANDED*

30

KING, Circuit Judge, concurring in the judgment:

My friends in the majority have properly determined that Jones's dry cell treatment — as revealed by this record — was "gross, degrading, and deeply concerning." *See ante* at 15. Their fine opinion, however, does not answer the important question of whether such treatment contravenes the Eighth Amendment. I would conclude that it did. On this record, Jones was forced to eat and sleep in an alarmingly soiled state. Forcing a human being to eat his food using hands dirtied by fecal matter is well beyond contemporary standards of decency, and carries with it a substantial risk to personal health. As our former colleague Judge Wilkins once recognized, the "precepts of humanity and personal dignity animate the Eighth Amendment, [and] we are guided by contemporary standards of decency." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

I nevertheless agree with my good colleagues that an award of qualified immunity is appropriate with respect to Jones's Eighth Amendment claim. When the constitutional violation that I would recognize occurred, the law of our Circuit did not clearly establish the scope of Jones's constitutional right to basic elements of hygiene.

I therefore concur in the judgment.

31