**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1986

DERRICK COLEMAN, individually and as Administrator of the Estate of Devonte Coleman; TANGY COLEMAN,

Plaintiffs - Appellants,

v.

NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; KENNETH E. LASSITER, in his individual capacity as Director of Prisons; JOHN AND JANE DOES, employees of the North Carolina Department of Public Safety; BYRON BURT, in his individual capacity; REECO RICHARDSON, in his individual capacity; DEANISE ROYAL, in her individual capacity; BRONNIE MCLAMB, in her individual capacity; JESSICA WARD, in her individual capacity; DANA OLIVER, in her individual capacity; PAULA DIGGS, in her individual capacity; AZENET SALAS, in her individual capacity; CHRISSY TADJOU, Sgt, in her individual capacity; JOE RATLEY, in his individual capacity; EDWARD THOMAS, Warden, in his individual capacity; PETER R. BUCHHOLTZ, in his individual capacity; KRISTIE BRAYBOY, Warden, in her individual capacity,

Defendants - Appellees.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:20-cv-00570-MOC-SCR)

Argued:  January 28, 2025                                    Decided:  April 21, 2025

Before THACKER and HARRIS, Circuit Judges, and Elizabeth W. HANES, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:**  Samuel Cramer Lewis, DEVORE, ACTON & STAFFORD, P.A., Charlotte, North Carolina, for Appellants.    Alex Ryan Williams, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:** F. William DeVore, IV, Brittany N. Conner, DEVORE, ACTON & STAFFORD, P.A., Charlotte, North Carolina, for Appellants.  Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Derrick Coleman and Tangy Coleman (collectively "Appellants"[1]) are the father and stepmother of Devonte Coleman ("Coleman"). After Coleman's death, which resulted from a rare fungal infection he contracted while in custody, Appellants sued the North Carolina Department of Public Safety ("NCDPS"); NCDPS officials[2] in their individual capacities; various Jane and John Doe Employees of NCDPS in their individual capacities; and NCDPS officers[3] in their individual capacities (collectively "Appellees").[4] Relevant here, the lawsuit raised a claim based on the conditions of confinement imposed by various individual officers who guarded Coleman while he was in the hospital, as well as state law claims for conversion and obstruction of justice.

In this appeal, Appellants argue that the district court erred when it granted summary judgment to the individual guards after determining that they did not violate Coleman's Eighth Amendment right to be free from cruel and unusual punishment and that they were entitled to qualified immunity. Appellants have failed to satisfy the objective prong of the alleged conditions of confinement violation. Therefore, Appellants have failed to carry

---

[1] The caption of the case lists only Derrick Coleman as the administrator of Devonte Coleman's estate, but the district court referred to both Derrick and Tangy Coleman as administrators, so we refer to "Appellants" throughout.

[2] The NCDPS officials are Kenneth E. Lassiter, Director of Prisons, Warden Edward Thomas, Warden Kristie Brayboy, and Regional Director of NCDPS Peter R. Buchholtz.

[3] The officers are Byron Burt, Reeco Richardson, Deanise Royal, Bronnie McLamb, Jessica Ward, Dana Oliver, Paula Diggs, Aznet Salas, Chrissy Tadjou, and Joe Ratley.

[4] As explained below, Appellants amended their complaint multiple times to add various defendants.

their burden to establish that a constitutional violation occurred. As a result, we affirm the district court's grant of qualified immunity.

Additionally, Appellants argue that the district court erred by failing to consider whether Appellants' state law conversion and obstruction of justice claims, which are based on Coleman's missing personal effects and missing evidence in this case, could proceed against NCDPS under the North Carolina Constitution. Because Appellants raise these claims for the first time on appeal, we decline to address them.

I.

On April 18, 2017, Coleman was convicted of conspiracy to commit robbery with a dangerous weapon. He was sentenced to serve between two years and five months to three years and eleven months of incarceration. He was projected to be released in December 2018. On April 27, 2018, Coleman was transferred to Richmond Correctional Institution ("RCI")[5] in Hoffman, North Carolina.

Beginning a year after his incarceration, Appellants stopped receiving calls as frequently from Coleman and learned that he had been placed in solitary confinement at least twice because he had been making frequent complaints of pain. Appellants feared that Coleman was not receiving proper care.

---

[5] RCI was formerly named Morrison Correctional Institution. RCI was renamed effective October 4, 2021, because of the racist history of the prison's namesake, former Governor Cameron Morrison, "who was a leader of the 'Red Shirts,' a violent, post-Civil War organization that promoted white supremacy." Press Releases, *Prisons Updates Names of Five Facilities*, North Carolina Department of Public Safety (September 30, 2021), https://perma.cc/AL5D-L9ZC.

Coleman's medical records from RCI reflect that on May 8, 10, 16, 17, and 29, 2018, Coleman visited RCI's clinic complaining of pain, sinus congestion, face numbness, face swelling, watery eyes, headaches, an inability to breathe through his right nostril, a throbbing feeling on the inside of his face, nausea, and vomiting. Throughout the course of Coleman's clinic visits, the clinic diagnosed Coleman with maxillary sinusitis and chronic rhinitis. The clinic prescribed Coleman with various pain, allergy, and antibiotic medication to treat his symptoms.

On June 1, 2018, Coleman visited Moore Regional Hospital, which was off prison grounds. The hospital performed a CT scan. On June 5, 2018, Coleman visited an ophthalmologist at the University of North Carolina ("UNC") Hospital, which was also off prison grounds. The ophthalmologist recommended that Coleman visit an ear, nose, and throat specialist. Thereafter, on June 6, 2018, Coleman again visited the clinic at RCI, which analyzed the CT scan that had been performed at Moore Regional Hospital as reflecting a "phlegmon or abscess." J.A. 302.[6] The clinic decided to send Coleman to Rex Hospital's emergency room for further evaluation. On June 7 and 8, 2018, Coleman received treatment at Rex Hospital, which was likewise outside of the prison environment. Coleman was then once again returned to RCI. Upon Coleman's return to RCI, the RCI clinic notes from June 8, 2018, reflect that Rex Hospital diagnosed Coleman with "acute sinus infection requiring [incision and drainage]" and that the hospital requested Coleman be returned "as soon as possible" for intravenous antibiotic treatment because of a "fungal

---

[6] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

infection." J.A. 300. Coleman subsequently received treatment at Rex Hospital from June 9 to 15, 2018. Coleman was then transferred to Duke Regional Medical Center ("Duke") where he received treatment outside of the prison environment from June 15 to August 27, 2018.

Appellants believed that NCDPS was withholding information from them regarding Coleman's medical condition and location. On June 19, 2018, Appellants were informed by an NCDPS employee that they "could not disclose [Coleman's] location." J.A. 32. Thereafter, Appellants received a phone call from Duke's Chaplain informing them that Coleman was in the hospital and that his medical status was critical, but they were unaware of the full extent of his medical condition until they arrived at the hospital on June 26, 2018. Only then did Appellants learn that Coleman had undergone four major surgeries. Coleman's illness progressed over several months, and in early July 2018, when he was receiving care at Duke, doctors noted that the condition was fatal and began palliative care.

Coleman had contracted mucormycosis rhinosinusitis, a rare and deadly fungal infection caused by mold.[7] From June through September 2018, the disease affected his face, brain, and organs; it required multiple surgeries; caused him severe pain, including facial pain, headaches, nausea, fever, kidney injury, and severe anemia; and ultimately caused his death.

---

[7] *See* U.S. Centers for Disease Control and Prevention, *Mucormycosis Basics*, https://perma.cc/7JS8-YZQH (last visited March 17, 2025).

During his treatment at Duke, Coleman was guarded by employees of NCDPS, including Officers Burt, Richardson, Royal, Mclamb, Ward, Oliver, Diggs, Salas, Tadjou, Ratley, and Buchholtz.  All were aware of Coleman's illness and terminal status. Appellants were initially allowed to visit Coleman at Duke for one day a week for one hour visits.  However, upon Coleman's terminal diagnosis, they were allowed to visit three days a week for one hour visits.  But Coleman was denied the ability to see his children despite his terminal condition and despite physician requests for visitation.  Coleman was granted early medical release from custody on August 27, 2018.  He died on September 9, 2018.

On September 1, 2020, Appellants, individually, and Derrick Coleman as the representative of Coleman's estate, filed a lawsuit in Mecklenburg Superior Court in North Carolina against  NCDPS, various NCDPS officials in their individual capacities, as well as various Jane and John Does in their individual capacities because Appellants were unaware of the identities of the guards at that time.

Appellants alleged claims pursuant to 42 United States Code § 1983 based on inhumane conditions of confinement and the failure to provide necessary and reasonable medical care (Counts One–Three), as well as state law claims based on negligence (Count Four), cruel or unusual punishment per the North Carolina Constitution (Count Five), conversion (Count Six), intentional infliction of emotional distress (Count Seven), punitive damages (Count Eight), and obstruction of justice (Count Nine).  Appellants alleged all claims against NCDPS and all but the punitive damages claim against the individual officers.  This appeal relates exclusively to the condition of confinement claim against the

7

individual officers (Count Three) and the conversion and obstruction of justice claims against NCDPS (Counts Six and Nine, respectively).

On October 16, 2020, Appellees removed the case to federal district court. On April 6, 2021, Appellants filed their First Amended Complaint, removing reference to Jane and John Does and adding ten defendants, including Officers Burt, Richardson, Royal, Mclamb, Ward, Oliver, Diggs, Salas, Tadjou, and Ratley, who Appellants sued in their individual capacities. On November 10, 2021, Appellants filed their Second Amended Complaint, reinstating reference to Jane and John Doe employees of NCDPS and adding three new supervisory defendants, including Thomas, Buchholtz, and Brayboy.

Appellants take issue with Appellees' conduct toward Coleman. Specifically, they allege that Coleman was not allowed to use the restroom in his hospital room and instead was required to urinate in a urinal in his hospital bed in front of family members and guards while being covered by a sheet and handcuffed to the bed. Appellants further allege that Officers Royal, Tadjou, Salas, and Oliver discarded Coleman's food if it was not eaten fast enough and/or did not allow him to have food from outside the hospital. Appellants also aver that Officers Salas, Burt, Richardson, and McLamb tightened Coleman's handcuffs to the point where they were "cutting off or reducing [his] circulation" and that Coleman was not allowed to have physical contact with visiting family members without permission. J.A. 35. Additionally, Appellants take issue with the officers allegedly "blar[ing]" the television, disrupting Coleman's rest, and not allowing him to exercise outside of the hospital. *Id.*

8

Appellants say that they requested that the guards discontinue the above behavior and relayed their complaints to NCDPS. Appellants were unable obtain the names of the specific guards subjecting Coleman to the objectionable conditions before the lawsuit was filed. But, based on video depositions obtained through the course of the litigation, Appellants were able to identify Officers McLamb, Burt, Oliver, Royal, Ward, Diggs, and Salas as individual guards who they say forced Coleman to urinate in a cup in front of guards and family while handcuffed to the hospital bed despite the availability of an in room restroom. Appellants further identified Officer Royal as having thrown away Coleman's food if not eaten fast enough and McLamb as having tightened Coleman's restraints.

Appellants also allege that NCDPS failed to return Coleman's personal belongings, including letters and other writings, to Appellants following Coleman's death. Additionally, Appellants take issue with fifteen days of missing hospital logs that NCDPS failed to produce in discovery. The hospital logs were maintained by the guards during their shifts and reflect "the individuals that were there, the times that they were there, the days that they were there, and what was done, whether family came in . . . whether care was given to him by the guards or what the guards did." J.A. 205. Appellants requested the hospital logs for each day that Coleman was hospitalized. In response, Appellees provided logs for the majority of the time Coleman was hospitalized, but did not produce hospital logs for July 11, August 6, or August 15–27.

On September 27, 2022, Appellees filed a motion for summary judgment as to all claims. On January 18, 2023, the district court held a hearing on the motion for summary

9

judgment. And on August 24, 2023, the district court granted Appellees' motion for summary judgment.

Relevant here, the district court granted qualified immunity to the individual and supervisory officers because the court determined that "no constitutional violation [occurred] in the first instance."[8] J.A. 264. And "even if a constitutional violation did occur, [the individual officers were] nonetheless entitled to qualified immunity" because Coleman did not have a clearly established right, at the time of the officers' actions, against the complained of conditions -- even when "the alleged inhumane conditions" were considered in "combination." J.A. 264–65.

The district court dismissed the obstruction of justice and conversion claims against NCDPS as "intentional torts . . . barred by the doctrine of sovereign immunity." J.A. 251.

Appellants timely appealed.

## II.

"We review de novo district court decisions on motions for summary judgment, qualified immunity, and state public official immunity." *Caraway v. City of Pineville*, 111 F.4th 369, 378 (4th Cir. 2024) (internal quotation marks omitted) (citation omitted). "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

---

[8] The district court independently determined that the officers' conduct did not amount to an Eighth Amendment violation and, as a result, granted summary judgment on the conditions of confinement claim against the individual officers on this basis apart from its qualified immunity determination. However, because we affirm on the basis of qualified immunity, we do not address this independent basis.

10

*Jones v. Solomon*, 90 F.4th 198, 206 (4th Cir. 2024) (citation omitted) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

III.

A.

Qualified Immunity

We first address Appellants' challenge to the district court's grant of qualified immunity to the individual officers.

Section 1983 of Title 42 of the United States Code "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Jones v. Solomon*, 90 F.4th 198, 207 (4th Cir. 2024) (citation omitted)

"Nevertheless, a government official sued under § 1983 is entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit itself." *Caraway v. City of Pineville*, 111 F.4th 369, 381 (4th Cir. 2024) (citation omitted). "And the defense of qualified immunity is meant to 'provide[] ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (alteration in original) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The "qualified immunity analysis asks two questions: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation." *Id.* (internal

11

quotation marks omitted) (citation omitted). "'If the answer to either question is 'no,' the officer being sued is entitled to qualified immunity.'" *Id.* (quoting *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023)).

"[W]e have a split burden of proof for the qualified-immunity defense." *Jones*, 90 F.4th at 207 (alterations in original) (quoting *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022)). "The plaintiff bears the burden on the first [(constitutional right)] prong, and the officer bears the burden on the second [(clearly established)] prong." *Id.*

1.

Constitutional Violation

We begin with the first inquiry, which "asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officers' conduct violated a constitutional right." *Caraway*, 111 F.4th at 381 (cleaned up) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014)). Here, although we generally analyze liability under § 1983 individually for each defendant, we need not conduct a defendant by defendant analysis because the individual officers all shared at least partial responsibility for the challenged conditions and we conclude that even those conditions in their totality did not rise to the level of a constitutional violation.

As to the constitutional right at issue, Appellants contend that the individual officers violated Coleman's Eighth Amendment right to be free from "cruel and unusual punishments." U.S. Const. amend. VIII.

The "prohibition [against cruel and unusual punishments] 'proscribes more than physically barbarous punishments.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir.

12

2016) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). The Eighth Amendment requires prison officials to "'provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care." *Id.* (cleaned up) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (prison officials may not "deprive inmates of the minimal civilized measure of life's necessities")).

To prevail on a conditions of confinement claim, "a prisoner must prove two elements—that the deprivation of a basic human need was *objectively* sufficiently serious, and that *subjectively* the officials acted with a sufficiently culpable state of mind." *Jones*, 90 F.4th at 208 (quoting *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (cleaned up) (emphasis in original)).

a.

Objective Prong

Conditions of confinement violate the Eighth Amendment if "the conditions deprived the plaintiff of a specific human need." *Jones*, 90 F.4th at 209 (cleaned up). In order to satisfy the objective prong, the deprivation must be "extreme" -- "meaning that it poses a serious or significant physical or emotional injury resulting from the challenged conditions, or a substantial risk of such serious harm resulting from . . . exposure to the challenged conditions." *Scinto*, 841 F.3d at 225 (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks omitted)). Only extreme deprivations satisfy the objective prong because "'the Constitution does not mandate comfortable prisons.'" *Jones*, 90 F.4th at 209 (quoting *Rhodes*, 452 U.S. at 349). To be

unconstitutional, the conditions must be "cruel and unusual under contemporary standards," but "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (quoting *Rhodes*, 452 U.S. at 347).

The district court found that Appellants' undisputed evidence demonstrated that, during Coleman's three month hospital stay, NCDPS guards imposed various restrictions upon him pursuant to NCDPS policies. Namely, the district court found that Coleman was not allowed by guards to go outside of the hospital, exercise outside, have any outside food because it was considered contraband, take too long to eat, have any direct contact with his loved ones without permission from guards, or remove his handcuffs. The court further found that Coleman "was required to urinate," to eat, and to sleep while handcuffed to the hospital bed. J.A. 256. Finally, the district court found that Coleman was also denied the ability to see his children despite his terminal condition and despite physician requests for such visitation. The district court held that the limitations placed on Coleman based on NCDPS policy "were all based on legitimate penological interests," including "to prevent escape, prevent introduction of contraband, and protect the public and staff." *Id.* at 257, 263. The district court held, "even considered cumulatively, these conditions did not deprive [Coleman] of his Eighth Amendment rights." *Id.* at 257.

Appellants contend that the district court did not properly consider the totality of the circumstances by failing to consider Coleman's terminal status. But, the district court did, in fact, consider Coleman's terminal status. *See* J.A. 256 (considering the imposition of the restrictions upon Coleman "despite that he was terminally ill" and whether the

14

restrictions "deprived [him] of . . . identifiable human needs"). Appellants further argue that, although the guards' conduct, in itself, "may not [have been] cruel and unusual standing alone[,] . . . [Coleman] was subjected to conditions that, combined with his debilitating illness, transformed simple acts like relieving himself, attempting to sleep, or attempting to eat into substantial sources of emotional pain, humiliation, and needless embarrassment." Appellants' Opening Br. at 29–31.

Appellees counter that the district court's grant of qualified immunity should be affirmed because Coleman was not deprived of a basic human need and no sufficiently serious injury resulted from the conditions. Rather, he merely experienced "discomfort . . . that is part of the penalty that criminal offenders pay for their offenses against society." Appellees' Resp. Br. at 19 (citation omitted).

i.

Use of Urinal

Requiring a hospitalized inmate to remain handcuffed while using a urinal in the presence of others rather than allowing him to use the restroom in the hospital room does not rise to the level of a deprivation of an objectively sufficiently serious basic human need because "only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim." *Jones*, 90 F.4th at 209 (citation omitted).

The district court held that requiring an inmate to "use . . . a medical urinal, bottle/cup, or catheter is not a constitutional violation." J.A. 258 (citations omitted). In support of their position to the contrary, Appellants point to *Karn v. PTS of America, LLC*, where the totality of circumstances reflected a deprivation of an objectively serious basic

15

human need for inmates to relieve themselves.  590 F. Supp. 3d 780, 793 (D. Md. 2022).

Aside from the fact that a district court opinion is not binding on us, the case at hand is

easily distinguishable from the situation in *Karn*.  *Id.*  In *Karn*, the inmates were denied

bathroom breaks and the opportunity to wash while in a transportation van for several days,

and they were required to "use plastic water bottles and bags as toilets," which resulted in

"urine bottles rolling back and forth hitting the . . . walls, [causing urine] on the floor [and

resulting in] . . . flies."  *Id.*  In sharp contrast, here Coleman was permitted to relieve

himself in a hospital urinal whenever he needed to urinate.

Appellants further cite to *LaFaut v. Smith*, wherein we found a deprivation of an

objectively serious basic human need in part because the plaintiff, a paraplegic confined to

a wheelchair, was placed in a room that had a toilet without handrails, a toilet seat with a

larger opening than standard toilet seats, and walls around the toilet, which made the toilet

inaccessible for his wheelchair.  834 F.2d 389, 392–94 (4th Cir. 1987).  As a result, the

plaintiff was forced to drag himself across the floor in order to hoist himself up onto the

toilet.  Due to the toilet's larger opening and the lack of handrails, the plaintiff in *LaFaut*

also frequently fell into the toilet and, on one occasion, broke his leg because he "fell off

[of] the toilet." *Id.* at 393.

Here, Coleman was required to use a urinal in his hospital bed rather than being

allowed to use the bathroom in his hospital room.  While the egregious facts considered in

*LaFaut* do not set the standard for Eighth Amendment violations, Coleman's use of a urinal

does not constitute an "unnecessary and wanton infliction of pain."  834 F.2d at 391

(quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  Unlike in *LaFaut*, Coleman was

16

not forced to risk his safety in order to relieve himself, nor did he suffer additional physical injury from using the urinal. He did not, therefore, suffer an "extreme deprivation" sufficient to satisfy the objective prong. *Jones*, 90 F.4th at 209.

ii.

Rushed Meals/No Outside Food

Likewise, we discern no Eighth Amendment violation regarding Coleman's alleged rushed meals or inability to consume outside food.

A limitation on the time in which Coleman could eat or an inability to have food from outside the hospital does not rise to the level of a deprivation of an objectively sufficiently serious basic human need. The Supreme Court has held that prison officials must provide inmates with "adequate food," *Farmer*, 511 U.S. at 832, and we have held "the Eighth Amendment[] require[s] that prisoners receive special diets when medically appropriate." *Scinto*, 841 F.3d at 233. However, a limited number of missed meals and time limitations for inmates to eat do not support finding a constitutional violation. Such is the evidence here, where the hospital staff, not the guards, typically collected the food trays from Coleman's room. And, although there was some evidence that one guard, Officer Royal, did not let Coleman eat certain food that she discarded, that evidence, standing alone, is not a constitutional violation. Even if Officer Royal removed trays of hospital food in addition to outside food, the record indicates that she did so, at most, a few times. To the extent she threw away "outside" food, she did so per NCDPS policy that an inmate could only have the hospital food provided to him because other food was considered "contraband." J.A. 145.

17

We, along with the Supreme Court, have recognized that the "penological justification supporting a challenged condition is relevant in a conditions of confinement case." *Porter v. Clarke*, 923 F.3d 348, 362 (4th Cir. 2019), *as amended* (May 6, 2019) (citing *Rhodes*, 452 U.S. at 346 ("Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'")).

The mere fact that a limitation appears within prison policy does not create a legitimate penological interest for the purposes of the objective prong. But, here, the district court found that it was "undisputed that NCDPS policies required the Defendant Guards to impose most of the conditions for which Plaintiffs complained" and that the limitation on outside food was based on the legitimate penological interest of preventing contraband. J.A. 260, 262. Therefore, we likewise conclude that legitimate penological interests supported disallowing Coleman from having outside food because it was considered contraband pursuant to NCDPS policy.

Thus, the limited time period for Coleman to eat and his inability to have outside food did not deprive him of an objectively sufficiently serious basic human need and legitimate penological interests supported the complained of conduct.

iii.

Exercise

With respect to exercise, "depriving inmates of all meaningful opportunities to exercise generally violates the Eighth Amendment['s]" proscription against cruel and unusual punishment. *Mitchell v. Rice*, 954 F.2d 187, 193 (4th Cir. 1992). But that is not what happened here.

18

Based on the undisputed evidence, the district court found that Coleman "regularly walked throughout the facility, and he exercised regularly." J.A. 259. Indeed, Officer Oliver testified that she, along with a nurse, walked around the hospital with Coleman pursuant to doctor's orders in order to "ambulate" him. *Id.* at 164–65. With respect to being outside, Officer Ward testified that NCDPS policy as well as Duke's policy regarding inmates was that they were not permitted to go outside the hospital. In this vein, Officer Ward described a situation where nurses wished to take Coleman outside to sit in the sun, but Officer Ward declined and discussed it with the "head security officer" at Duke who also stated that the excursion outside would be against Duke's policy regarding inmates. *Id.* at 157. Officer Ward further testified that she called RCI to confirm the policy and was instructed that "[Coleman was] not to go outside." *Id.* at 158–59. Legitimate penological justifications support the NCDPS policy of not allowing inmates outside the hospital because it is an unsecure setting. Coleman remained an inmate after all.

As a result, the record firmly establishes that, although Coleman was not allowed outside the hospital, he was not deprived of all meaningful opportunities to exercise. Therefore, the challenged conduct did not deprive Coleman of an objectively sufficiently serious basic human need and was not an extreme deprivation adequate to satisfy the objective component of the Eighth Amendment claim.

iv.

Overtightened Restraints

Finally, we do not find, based on the evidence in the record, that Coleman suffered a constitutional violation from the overtightening of his restraints. To demonstrate an

19

extreme deprivation in the conditions of confinement context, Appellants were required to "produce evidence of a serious or significant . . . injury" or "demonstrate a substantial risk of . . . serious harm" that resulted from officers overtightening Coleman's restraints. *Jones*, 90 F.4th at 209 (quoting *Shakka*, 71 F.3d at 166). The district court held, "Plaintiffs have presented no evidence to show that the [overtightened] restraints . . . posed a severe risk of harm and/or result[ed] in any injuries that were sufficiently serious." J.A. 260.

Coleman's parents claimed that his restraints were too tight, and at least on one occasion, caused Coleman's legs to swell. But, the district court did not err in concluding that Coleman's alleged injury as a result of the overtightened restraints did not amount to an Eighth Amendment violation because it did not rise to the level of a "serious or significant" physical injury that would sustain an Eighth Amendment conditions of confinement claim. In *Scinto v. Stansberry*, we provided guidance regarding when conduct rises to the level of an extreme deprivation sufficient to satisfy the objective prong's seriousness requirement. 841 F.3d 219, 225, 228 (4th Cir. 2016). There, we stated that the failure to provide insulin to a prisoner diagnosed with diabetes "may be sufficient to meet the objective test." *Id.* at 228. In contrast, here, a temporary reduction in circulation caused by the allegedly overtightened restraints plainly does not amount to an Eighth Amendment violation.[9]

---

[9] At the time of the alleged overtightening, Coleman was hospitalized at Duke. We, like the district court, recognize that Duke is one "of North Carolina's top hospital[s]." J.A. 254. Importantly, Derrick Coleman testified that he could not recall an occasion where Duke's medical staff ever asked the officers to loosen the restraints. In contrast, the complaint notes that "[o]n several occasions medical staff" requested that the guards reduce (Continued)

20

v.

Cumulative Effect of Challenged Conditions

Appellants, apparently aware of their weak position regarding each individual challenged condition, concede that the complained of conditions "may not be cruel and unusual standing alone" and "may not be [] per se Eighth Amendment violation[s]." Appellants' Opening Br. at 29, 37.  But Appellants argue that the complained of conditions in totality -- being restrained,[10] required to eat quickly, disallowed from exercising outside, subjected to the television being played loudly, disallowed contact visits, and not permitted to receive visits from his children[11] -- when considered in combination with Coleman's

_____

the television's volume.  J.A. 35.  Therefore, it is reasonable to conclude that medical staff would have likewise intervened if the restraints were too tight.  This further supports that the claimed injury was not sufficiently serious.

[10] Appellants argue that Coleman being restrained while experiencing other complained of conditions heightened the severity of the alleged deprivation.  The district court determined that Appellants failed to illustrate "that being restrained to his bed imposed a severe risk of harm to [Coleman]," particularly because the "restraints were [periodically] removed [when] he . . . exercise[d]" and "when he . . . under[went] treatment in the hyperbaric chamber, a treatment he routinely received according to the hospital logs."  J.A. 259.  We agree with the determination of the district court that "restraining an inmate to his bed does not amount to a constitutional violation" *Id.* at 258.  Particularly because the legitimate penological interests of reducing the risk of escape and assault support restraining hospitalized inmates to their beds.

[11] The district court determined that neither we nor the Supreme Court recognize a constitutional right to prison visitation, so NCDPS policies did not violate Coleman's constitutional rights.  Depriving a dying inmate from visitation with his children "may be callous," J.A. 260, but we have not previously recognized a clearly established "'constitutional right to visitation in prison.'" *Desper v. Clarke*, 1 F.4th 236, 243–44 (4th Cir. 2021) (first quoting *Williams v. Ozmint*, 716 F.3d 801, 806 (4th Cir. 2013); then citing *Oxendine v. Williams*, 509 F.2d 1402, 1407 (4th Cir. 1975) (an inmate "has no constitutional right to physical contact with his family"); and then citing *White v. Keller*, (Continued)

21

"physical and psychological circumstances" "create[d] a deprivation of constitutional magnitude." Appellants' Opening Br. at 27–28.

We do not agree. The district court considered the challenged conditions individually as well as based on their cumulative effect on Coleman. *See* J.A. 257 ("[T]he Court finds that, even considered cumulatively, these conditions did not deprive [Coleman] of his Eighth Amendment rights."). Even considering the challenged conditions cumulatively, we hold that the district court did not err in concluding there was no Eighth Amendment violation. Our case law makes clear that only conditions of confinement that deprive a plaintiff of a "specific human need" violate the Eighth Amendment where the deprivation is "extreme." *E.g., Jones*, 90 F.4th at 209; *Scinto*, 841 F.3d at 225. "[R]estrictive" and "even harsh" conditions are not unconstitutional unless they are "cruel and unusual under contemporary standards." *Jones*, 90 F.4th at 209 (quoting *Rhodes*, 452 U.S. at 347 (internal quotation marks omitted)).

b.

### Subjective Prong

Because Appellants have failed to satisfy the objective prong of the alleged conditions of confinement violation, we need not address whether the individual guards subjectively acted with a sufficiently culpable state of mind.

---

588 F.2d 913, 914 (4th Cir. 1978) (affirming the district court's determination that there is no constitutional right to prison visitation)).

2.

Clearly Established

Appellants have failed to carry their burden to establish that a constitutional violation occurred. As a result, we need not address whether the claimed right was clearly established at the time of the alleged violation. As we have repeatedly stated, if the answer to either of the qualified immunity questions, that is, whether a constitutional violation occurred or whether the right to be free from the alleged violation was clearly established, is no, then the officer being sued is entitled to qualified immunity.

There is no constitutional violation here. Therefore, qualified immunity is appropriate.

B.

Conversion and Obstruction of Justice Claims

Appellants further argue that the district court erred when it granted summary judgment to NCDPS on Appellants' conversion and obstruction of justice claims.

The conversion claim is based on the fact that "NCDPS failed to return . . . [Coleman's] personal belongings," including letters and other writings, to Appellants upon Coleman's early medical release and death, "despite the demand that the belongings be returned." Appellants' Opening Br. at 15–16. The obstruction of justice claim is based on fifteen days of missing hospital logs,[12] which Appellants claim was an

---

[12] In discovery, Appellants requested the hospital logs for each day that Coleman was hospitalized. In response, Appellees produced logs for the majority of the time (Continued)

23

intentional act designed to prevent Appellants from connecting "numerous NCDPS agents to the inhumane conduct that they witnessed." *Id.* at 13.

The district court dismissed both claims because "conversion [and] obstruction of justice . . . are . . . intentional torts . . . barred by the doctrine of sovereign immunity." J.A. 251. Nonetheless, on appeal, Appellants contend that the district court failed to consider whether the conversion and obstruction of justice claims could proceed directly under the North Carolina Constitution as claims amounting to cruel or unusual punishment pursuant to Article I, section 27 of the North Carolina Constitution. *See Corum v. Univ. of N.C.*, 413 S.E.2d 276, 291–92 (N.C. 1992) ("The doctrine of sovereign immunity cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their rights guaranteed by the Declaration of Rights . . . . [W]hen there is a clash between . . . constitutional rights and sovereign immunity, the constitutional rights must prevail.").

Crucially, Appellants raise this argument for the first time on appeal. As Appellees highlight, Appellants impermissibly "change theories of recovery [on appeal]" by "switching the alleged cruel or unusual punishment from one involving the guards' treatment of [Coleman] in the hospital to one involving NCDPS' handling of [Coleman]'s personal property and NCDPS internal records." Appellees' Resp. Br. at 9.

---

Coleman was hospitalized, but did not produce hospital logs for July 11, August 6, or August 15–27.

24

We are of the view the missing logs are suspect because, without them, it would be difficult for Appellants to specifically identify "which alleged actions were performed by which [Appellee]." Appellees' Resp. Br. at 17. The fact that logs are missing would also make it difficult for Appellants to carry their burden to satisfy the subjective prong of their Eighth Amendment conditions of confinement claim and demonstrate Appellees' deliberate indifference because "[l]iability under § 1983 must be analyzed individually for each defendant" and "each [d]efendant may only be held responsible 'for his or her own misconduct.'" *Jones*, 90 F.4th at 207, 209 (first citing *King v. Riley*, 76 F.4th 259, 269 (4th Cir. 2023); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

Yet, despite the fact that certain hospital logs went missing is of concern, it is well established that we "do[] not consider issues raised for the first time on appeal, absent exceptional circumstances." *Tarashuk v. Givens*, 53 F.4th 154, 167 (4th Cir. 2022) (internal quotation marks omitted) (citations omitted). "When a party in a civil case raises an argument for the first time [on appeal], we may reverse only if the newly raised argument establishes fundamental error or a denial of fundamental justice." *Id.* (cleaned up). "The burden is on the party who has failed to preserve an argument to show that this standard is met." *Id.* (cleaned up). Here, Appellants have not alleged any exceptional circumstances warranting our review of this issue for the first time. *See Tarashuk*, 53 F.4th at 167. Nor have Appellants addressed our fundamental error standard or attempted to demonstrate that they can meet it here. Appellants have consequently failed to satisfy their burden of identifying a fundamental error warranting reversal on a ground not raised before the district court.

25

Therefore, we decline to address Appellants' appeal of the conversion and obstruction of justice claims restyled as North Carolina constitutional claims against NCDPS.

IV.

For the foregoing reasons, the grant of summary judgment is

*AFFIRMED*.